*Counsel listing on signature page*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

| | |
|---|---|
| JUANITA WYNNE, on behalf of herself and classes of those similarly situated, and DANTE BYRD, | Case No.  06-3153 CW |
| Plaintiffs, | **CONSENT DECREE** |
| v. | |
| MCCORMICK & SCHMICK'S SEAFOOD RESTAURANTS, INC. and MCCORMICK & SCHMICK RESTAURANT CORP., | |
| Defendants. | |

## TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.         LITIGATION BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.       PURPOSES OF THE CONSENT DECREE . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.      DEFINITIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

IV.     JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

V.      TERM OF THE DECREE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

VI.     CLASS DEFINITION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

VII.    RELEASE OF CLAIMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

VIII.   GENERAL EQUITABLE PROVISIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

IX.     SENIOR OFFICIAL AND REGIONAL EEO MANAGERS . . . . . . . . . . . . . . . 8

X.      DIVERSITY MONITOR . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

XI.     BENCHMARKS FOR JOB FILLS FOR FRONT OF THE HOUSE

                POSITIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

XII.    REGISTRATION OF INTEREST . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

XIII.   SHIFT AND SECTION ASSIGNMENT AND COMPENSATION . . . . . . . . . 18

XIV.   MANAGER INCENTIVE TO PROMOTE DIVERSITY . . . . . . . . . . . . . . . . . 18

XV.    INTERNAL COMPLAINT SYSTEM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

XVI.   RECRUITING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

XVII.  EMPLOYEE AND MANAGER TRAINING . . . . . . . . . . . . . . . . . . . . . . . . . 21

XVIII. REPORTING AND RECORDKEEPING . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

XIX.   COMPLIANCE REPORT TO THE COURT . . . . . . . . . . . . . . . . . . . . . . . . . 27

XX.    DISPUTE RESOLUTION AND ENFORCEMENT PROCEDURES . . . . . . . . 28

XXI.   MONETARY RELIEF, NOTICE AND CLAIMS PROCEDURE . . . . . . . . . . 31

XXII.  NOTICE TO CLASS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

XXIII. OBJECTIONS AND OPT OUTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

XXIV.        CLAIMS ADMINISTRATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

XXV.         SUBMISSION OF CLAIM FORMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

XXVI.        REVIEW OF CLAIM FORMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

XXVII.       PLAN OF ALLOCATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

XXVIII.      DIVERSITY MONITOR FEES AND EXPENSES . . . . . . . . . . . . . . . . . . . . 44

XXIX.        POST-APPROVAL ATTORNEYS' FEES AND EXPENSES . . . . . . . . . . . . . 44

XXX.         MISCELLANEOUS PROVISIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

## INTRODUCTION

As a result of extensive arms-length negotiations supervised by a mediator, the Parties have reached a voluntary agreement that is contained in this Consent Decree.

## I.     LITIGATION BACKGROUND

Plaintiffs Juanita Wynne and Dante Byrd filed class-wide administrative charges with the EEOC on May 3 and June 29, 2005.  On May 11, 2006 Plaintiffs filed the Complaint in this action alleging racial discrimination claims under Title VII, FEHA and Section 1981 on behalf of themselves and classes of McCormick & Schmick's African American employees and applicants.

Plaintiffs filed their First Amended Complaint on July 28, 2006.  After filing the First Amended Complaint, the parties conducted discovery.  Plaintiffs took the depositions of six Rule 30(b)(6) designees relating to Company operations, hiring practices, training, compensation policies, store openings, data collection, and others.  Company deponents included the Director of Human Resources, the Director of Training, the Vice President of Operations, and others.  During this period, Defendants took depositions of plaintiffs Juanita Wynne and Dante Byrd.  Plaintiffs served written discovery, including interrogatories and document requests, and obtained many thousands of pages of documents from Defendants, including personnel manuals and policies, training materials, and employment applications.  Plaintiffs also obtained, and with the assistance of expert statisticians analyzed, Company computerized personnel and payroll data from 2003 through 2006.

Defendants served written discovery on Juanita Wynne and Dante Byrd.  Juanita Wynne and Dante Byrd responded to interrogatories and produced hundreds of pages of documents related to their employment at McCormick & Schmick's.

Plaintiffs and Defendants engaged expert consultants to analyze the payroll data, to determine whether disparities exist in hiring and compensation of African Americans in front of the house positions, and to calculate potential damages exposure.  Expert consultants also assisted the parties in negotiating the settlement by proposing and analyzing various

methodologies for establishing hiring benchmarks.

The Plaintiffs have vigorously prosecuted this case, and McCormick & Schmick's has vigorously contested it.  As a result, the Parties were able to assess reliably the relative merits of the claims of the Plaintiffs and of McCormick & Schmick's defenses. On July 12, September 26, and November 5, 2007, counsel for the Parties met to negotiate a settlement of this matter with the assistance of experienced mediator Hunter Hughes of Atlanta, Georgia.  In addition, counsel for the Parties met face-to-face without the mediator on August 8 and September 12, 2007, and exchanged numerous written settlement proposals from July 2007 through February 2008.

The Parties agree that the formal and informal discovery conducted in this action – the depositions taken by both sides, the documents produced, and the information exchanged during mediation, including expert consultant analyses, are sufficient to assess reliably the merits of the respective parties' positions and to compromise the issues on a fair and equitable basis.  As reflected by the signatures of counsel at the end of this document, the Parties have consented to entry of this Decree.

## II.    PURPOSES OF THE CONSENT DECREE

The Parties have entered into the Consent Decree for the following purposes:

A.    To resolve all disputes covered by this Consent Decree in such a way as to avoid further expensive and protracted litigation;

B.    To use their Best Efforts to achieve equal employment opportunity for African Americans working at McCormick & Schmick's restaurants; and

C.    To create an expedited procedure for implementing equitable relief pursuant to the terms of this Decree and distributing a monetary settlement to eligible members of the Settlement Class.

## III.   DEFINITIONS

A.   "African American" for class membership purposes means all persons having origins in any of the Black racial groups of Africa, and includes individuals who identify as Black or African American, or who identify as more than one race so long as at least one of the races identified is Black or African American.

B.   "Applicant Flow" means the percentage of individuals applying for specified positions who are African American, as specified in Section XI(A)(1) of the Decree.

C.   "Back of the house" positions means all non-exempt restaurant-level positions not included in the definition of "Front of the House" positions.

D.   "Best Efforts" means all reasonable steps necessary to comply with the specific objective to which the Best Efforts are directed.

E.   "Civil Action" means *Wynne v.McCormick & Schmick's Seafood Restaurants, Inc*, Case No. 06-3153 CW (N.D. Cal.).

F.   "Class Counsel" means Altshuler Berzon LLP; Lieff, Cabraser, Heimann & Bernstein, LLP; Lewis, Feinberg, Lee, Renaker & Jackson, P.C.; The Lawyers' Committee For Civil Rights Of The San Francisco Bay Area; Thomas A. Warren Law Offices; and Kingsley & Kingsley.

G.   "Class Representative" means Juanita Wynne.

H.   "Expected Representation of African Americans in the Labor Market" is defined in Section XI(A)(2) of the Decree.

I.   "Injunctive Relief Class" is defined in Section VI of this Consent Decree.

J.   "Monetary Settlement Class" is defined in Section VI of this Consent Decree.

K.   "Company" means McCormick & Schmick's Seafood Restaurants, Inc. and McCormick & Schmick Restaurant Corp.

L.   "Company-wide Benchmark" means the company-wide benchmark as set forth in Section XI(B) of the Decree.

M.      "Final Approval Date" means the date upon which the Court signs this Decree after having found that it is fair, adequate and reasonable.

N.      "Front of the House" positions or jobs means: waiter, waitress, server, host, hostess, bartender, and cocktail server.

O.      "McCormick & Schmick's" refers to McCormick & Schmick's Seafood Restaurants, Inc. and McCormick & Schmick Restaurant Corp.

P.      "Party" or "Parties" means the Class Representative and McCormick & Schmick's.

Q.      "Preliminary Approval Date" means the date upon which the Court enters an Order preliminarily approving this Decree, directing notice and an opportunity for persons falling within the definition of the Settlement Class to opt out of the Settlement Class or submit an objection to the Decree, and setting a fairness hearing.

R.      "Relevant Census Occupation" means, for the waiter/waitress/server/ cocktail server positions, Census Occupation Code 411 (waiters and waitresses).  For the bartender position, the Relevant Census Occupation Code is 404 (Bartenders).  For the host position, the Relevant Census Occupation Code is 415 (Hosts and Hostesses).

S.       "Release" means the Release of claims set forth in Section VII of the Decree.

T.      "Released Parties" means the Parties who are beneficiaries of the Release of Claims set forth in Section VII of the Decree.

U.      "Released Claims" means the Claims released as set forth in Section VII of the Decree.

V.      "Relevant Geographical Area" means all census-defined counties/county sets within a 25-mile radius that contribute one or more employees to that particular restaurant's workforce.  Determination of counties/county sets will be based on the ZIP codes of employee home addresses for all employees at the restaurant.

W.      "Restaurant Benchmark" means the restaurant-level benchmark as set forth in Section XI(A) of the Decree.

X.      "Settlement Class" is defined in Section VI of the Decree.

Y.      "Settlement Effective Date" shall mean the first day following the last of the following occurrences:

1.      The date on which the Final Order approving the Settlement has been signed; or

2.      If an objection has been made to the settlement, the date the time to appeal or seek permission to appeal or seek other judicial review of the entry of a Final Order approving the Settlement has expired with no appeal or other judicial review having been taken or sought; or if an appeal or other judicial review has been taken or sought, the date the Final Order is finally affirmed by an appellate court with no possibility of subsequent appeal or other judicial review therefrom, or the date the appeal(s) or other judicial review therefrom are finally dismissed with no possibility of subsequent appeal or other judicial review therefrom.

Z.       "Term of the Decree" means the period described in Section V of the Decree.

AA.     "White" means all persons who identify as White and do not identify as more than one race.

## IV.    JURISDICTION

The Court has jurisdiction over the parties and subject matter of this Civil Action.  The First Amended Complaint in this action asserts claims that, if proved, would authorize the Court to grant the equitable and monetary relief set forth in this Decree.

Venue is proper in this Court.  The Court shall retain jurisdiction of this Civil Action during the Term of the Decree for the purpose of entering all orders authorized by the Decree, which may be necessary to implement the relief provided in the Decree or to enforce the provisions of the Decree.

## V.    TERM OF THE DECREE

A.      The equitable provisions of this Decree are effective immediately upon the Final Approval Date.

B.      Except as otherwise provided herein, the provisions of this Decree and the

agreements contained herein shall remain in effect for a period of five (5) years from the Final Approval Date, provided, however, that four (4) years after the Final Approval date, the Court may terminate the Decree, upon motion of the Company, if the Company has met all of its Company-wide Benchmarks (as defined in Section XI(B) below) during any consecutive three-year period prior to the fourth anniversary of the Decree.

## VI.    CLASS DEFINITION

A.    Injunctive Relief Class

For purposes of the injunctive and declaratory relief provided in this Decree, the Settlement Class is certified under Federal Rule of Civil Procedure 23(b)(2) and consists of: "All African Americans employed by McCormick & Schmick's in Front of the House or Back of the House positions between May 15, 2002 and the date the Decree terminates."

B.    Monetary Relief Class

1.    For purposes of the monetary relief provided in this Decree, the Settlement Class is certified pursuant to Federal Rule of Civil Procedure 23(b)(3) and consists of:  "All African Americans employed by McCormick & Schmick's in Front of the House or Back of the House positions between May 15, 2002 and the Preliminary Approval Date, except those who file a timely request to opt out of the monetary relief provisions of the Decree."

2.    All African Americans hired by the Company after the Preliminary Approval Date may avail themselves of the equitable relief provided in the Decree but shall not be entitled to any portion of the monetary relief provided hereunder.

3.    Settlement Class members who have filed a timely request to opt out of the monetary relief provisions of the Decree shall not be included in the Monetary Relief Class and shall not be held to release any claims for individual relief.

## VII.   RELEASE OF CLAIMS

A.      Release of Claims by Settlement Class.  Upon the Settlement Effective Date, all Monetary Relief Class Members who do not timely opt out will release all race discrimination claims against McCormick & Schmick's and its directors, officers, managers, agents, successors and assigns, which arise out of the conduct alleged in the First Amended Complaint under Title VII, 42 U.S.C. §1981, the California FEHA and/or any other state or federal law prohibiting race discrimination, for the liability period of May 15, 2002 through the Preliminary Approval Date.

B.      Release of Claims By Juanita Wynne and Dante Byrd.  Juanita Wynne and Dante Byrd, in exchange for consideration in the amount of $5,000 each, as provided in Section XXI(D)(4), will give McCormick's a release of all claims arising out of their application for employment and employment by McCormick's, including, for Ms. Wynne, a release of any non-class claims for race harassment/hostile work environment, and, for Mr. Byrd, a release of any non-class claims arising out of his application for employment with McCormick & Schmick's.

## VIII.   GENERAL EQUITABLE PROVISIONS

A.      The Company shall not engage in or be a party to any act, policy, practice or procedure that discriminates, retaliates, or has the purpose of discriminating or retaliating against any Class Representative or member of the Class, and employee of, or applicant to the Company, or any other person because he or she testified, furnished information or participated in any investigation, proceeding, or hearing in connection with this lawsuit or any charge or complaint of discrimination on which this lawsuit is based; testified, furnished information or participated in connection with the monitoring or implementation of this Decree; or sought and/or received monetary and/or non-monetary relief pursuant to this Decree.

B.      The Company shall make available to African-American employees and applicants the same opportunities and terms and conditions of employment as the Company affords similarly situated non-African American employees and applicants.

C.      Class Counsel will have sole and exclusive authority to act for the Class on issues of compliance or non-compliance with this Decree.

D.     The Company shall abide by the provisions of this Consent Decree, but otherwise shall maintain management discretion over decisions to select, hire, assign, transfer, train, promote, compensate, discipline, or terminate its employees.  Nothing in this Consent Decree shall require the Company to violate any applicable law, ordinance or regulation.

## IX.     SENIOR OFFICIAL AND REGIONAL EEO MANAGERS

A.     Within thirty (30) days of the Final Approval Date, and after consultation with Class Counsel, the Company shall appoint a senior-level Human Resources official ("Senior Official") to be responsible for internal monitoring of the Consent Decree provisions and providing annual monitoring reports to the outside monitor ("Diversity Monitor").  If Class Counsel disagrees with the appointment, Class Counsel may use the Dispute Resolution procedures set forth in Section XX.

B.     The Senior Official will report directly to the CEO and the Executive Committee of the Board of Directors.

C.     The Company will also appoint three regional Human Resources Managers to assist the Senior Official with processing employee complaints arising from units within their respective regions, regional recruitment efforts, regional diversity efforts, and any aspect of Consent Decree compliance, at the discretion of the Senior Official.

## X.     DIVERSITY MONITOR

A.     The parties agree to appointment of Barry Goldstein as Diversity Monitor.  In the event that Barry Goldstein becomes unavailable to serve as Diversity Monitor for any reason, Class Counsel and the Company will make a good faith effort to select on a joint basis a new Diversity Monitor.  If Class Counsel and the Company are unable to reach agreement as to a successor Diversity Monitor within forty-five (45) days following the date Barry Goldstein becomes unavailable to serve as Diversity Monitor, the Court shall appoint a successor Diversity Monitor upon motion of Class Counsel or the Company.  Class Counsel or the Company may nominate to the Court persons for consideration as a successor Diversity Monitor.  Class Counsel

and the Company shall each have the right to interview any nominated person, and to present

argument and evidence to the Court regarding the selection of the successor Diversity Monitor.

## XI.   BENCHMARKS FOR JOB FILLS FOR FRONT OF THE HOUSE POSITIONS

A.     Restaurant Benchmarks.  Within 13 months after the Final Approval date, and

every reporting period thereafter for the life of the decree, the Company shall, with respect to

persons placed in Front of the House positions during the preceding reporting period, calculate

for each restaurant, and report in its Progress Report (as defined in Section XVIII(D)), one

"Restaurant Benchmark" for servers and cocktail servers, one "Restaurant Benchmark" for

bartenders, and one "Restaurant Benchmark" for hosts, for the 12 month period following the

Final Approval date, and for each reporting period thereafter.

The "Restaurant Benchmark" for each position in each restaurant will be the higher of

"Applicant Flow" or "Expected Representation of African Americans in the Labor Market."

1.     Applicant Flow.  Applicant Flow means the percentage of all individuals

who applied for the specified position in the specified restaurant during the 12 months being

measured who are African American.  Applicant Flow shall be calculated as follows:  The

Company shall separately calculate Applicant Flow, for each restaurant, for each of the

following positions a) waiter/waitress/server/cocktail server, b) bartender, and c) host, as

follows: Calculate the number of applicants who applied for the specified position during the 12

month period under review.  The number of applicants for each position shall include all

individuals who applied for that position and also who applied for that position plus other

positions with the Company.  The number of applicants for each position shall not include

individuals whose applications fail to identify their race, or state more than one race but do not

specify the races.  Out of the total number of applicants for each position (as defined in

subsection a, above), calculate the number and percentage who identified themselves on the

applications as African American or Black, or who identified as more than one race and at least

one race identified is African American or Black, or, if the Company modifies the racial

categories on its application form to track the 2000 census codes, African American or Black

means individuals falling within census codes for Black non-Hispanic, plus Black and White non-Hispanic, plus Black and American Indian Alaskan Native. This percentage is the "Applicant Flow" for the specified position in the specified restaurant.

2. Expected Representation of African Americans in the Labor Market. The Company shall separately calculate Expected Representation of African Americans in the Labor Market, for each restaurant, for each of the following positions a) waiter/waitress/server/cocktail server, b) bartender, and c) host, as follows:

a. Calculate, for each restaurant and each position, the percentage of individuals within the "Relevant Geographical Area" who fall within the "Relevant Census Occupations Code" who are African American or Black, based on Census 2000 data. If, after 2010, but before the termination of the Decree, the Census Bureau completes and makes available an update of the "EEO Special File" containing data on occupations by race, the first set of such updated data shall be used for the calculation of benchmarks during the remainder of the term of the Decree. At no time, however, shall the Company be required to use any special EEO availability data source that is not a typical data source endorsed by the U.S. Department of Labor, OFCCP, for AAP reporting requirements of federal government contractors.

b. Relevant Geographical Area means all census-defined counties/county sets within a 25-mile radius that contributed one or more employees to that particular restaurant's workforce during the relevant year. Determination of counties/county sets will be based on the ZIP codes of employee home addresses for all employees at the restaurant, regardless of position held. Data from each census defined county/county set shall be weighted according to the percentage of employees residing in each county/county set.

c. For the waiter/waitress/server/ cocktail server positions, the Relevant Census Occupation Code is 411 (waiters and waitresses). For the bartender position, the Relevant Census Occupation Code is 404 (Bartenders). For the host position, the Relevant Census Occupation Code is 415 (Hosts and Hostesses).

d.  For the purpose of this calculation, African American or Black means individuals falling within census codes for Black non-Hispanic, plus Black and White non-Hispanic, plus Black and American Indian Alaskan Native.

B.    Company-wide Placement Benchmarks.  Within 13 months after the Final Approval date, and every 12 months thereafter for the life of the decree, the Company shall calculate three (3) "Company-wide Benchmarks:"

1) one for waiters/waitresses/servers/ cocktail servers,

2) one for bartenders, and

3) one for hosts.

The Company-wide Placement Benchmark for each position shall be calculated as follows:

1.    For each position, calculate the weighted average of the restaurant-by-restaurant Applicant Flow (as defined in Section XI(A)(1)).  The average shall be weighted for the total number of employees placed in the relevant position in each restaurant as of December 31 of the preceding year.

2.    For each position, calculate the weighted average of the restaurant-by-restaurant Expected Representation of African Americans in the Labor Market (as defined in Section XI(A)(2)).  The average shall be weighted for the total number of employees placed in the relevant position in each restaurant as of December 31 of the preceding year.

3.    For each position, the Company-wide Benchmark is the higher of the weighted average of the Applicant Flow and the weighted average of the Expected Representation of African Americans in the Labor Market.

C.    If Company-Wide Placement Benchmark Is Not Met

1.    If the Company reports in its annual Progress Report (Section XVIII(D)) that it has failed to meet any of its three position Company-wide Placement Benchmarks, the Diversity Monitor shall conduct an investigation to determine the cause(s) of the failure to meet the benchmarks not met, including, but not limited to, ascertaining

        a.     all of the individual restaurants that failed to meet the relevant Restaurant Benchmark;

        b.     the decision maker(s) responsible for hiring and job placement at such location(s);

        c.     the decision(s) leading to such failure.

        2.     Within 90 days after the date of the Progress Report, the Diversity Monitor shall issue a Diversity Monitor Report (Section XVIII(E)) that states, among other things, the Diversity Monitor's findings regarding whether the failure to meet an individual Restaurant Benchmark was due to a failure of the Company or any of its employees to make their Best Efforts to recruit, hire, retain, and/or promote African Americans or otherwise comply with the letter and spirit of the decree.  When evaluating whether the failure to meet a benchmark was due to a failure of the Company or any of its employees to use Best Efforts, the Diversity Monitor will consider the following factors, among others:

        a.     The percentage and number of employees by which the restaurant failed to achieve its benchmark.

        b.     Whether the restaurant failed to achieve its Restaurant Benchmark in preceding years, and if so by how much.

        c.     Whether the failure to achieve the Restaurant Benchmark is part of any national, regional or local trend of failing to achieve benchmarks.

        d.     Whether Applicant Flow at the restaurant(s) is increasing from year-to-year during the life of the Decree, using the data from the first half of 2007 as a point of comparison.

        3.     If the Diversity Monitor concludes that any failure to achieve a Restaurant Benchmark is due to a failure of the Company, or one of its restaurants, or any of its employees to make their Best Efforts to recruit, hire, retain, and/or promote African Americans or otherwise comply with the letter of spirit of the decree, the Diversity Monitor will inform Class Counsel and counsel for the Company.

D.     If The Diversity Monitor Finds That the Company or a Restaurant Failed to Make Best Efforts to Meet Benchmarks:

1.     If the Diversity Monitor issues a Diversity Monitor Report concluding that any failure to achieve a Restaurant Benchmark is due to a failure of the Company, or one of its restaurants, or any of its employees to make their Best Efforts to recruit, hire, retain, and/or promote African Americans or otherwise comply with the letter or spirit of the decree, Class Counsel and counsel for the Company will meet and confer to determine appropriate remedial measures.

2.     If Class Counsel and counsel for the Company are unable to agree on appropriate remedial measures within 30 days of the Diversity Monitor Report, Class Counsel and counsel for the Company will present the dispute to the Diversity Monitor.  The Diversity Monitor shall set appropriate and proportional remedial measures, which may include:

a.     Require restaurant(s) to hire African Americans into Front of the House positions from Registration of Interest lists (if any African Americans are on such list), until the restaurant(s) have hired a number that would have satisfied the benchmark in the previous year.

b.     Require the Company or individual restaurants to hire additional recruiters, and/or increase recruiting efforts at places or institutions with high African American representation (such as historically Black colleges or universities), or advertise in or recruit through media that reach large numbers of African Americans.

c.     Require restaurant(s), or the Company (if applicable) to validate hiring criteria that the Diversity Monitor determines have an adverse impact on African American applicants, and are not job related and consistent with business necessity.

d.     Require restaurant(s) to establish hiring safeguards, including 1) requiring that managers who make hiring decisions evaluate all applicants based on the same set of factors with the same rating system, and 2) requiring that at least two managers independently evaluate each applicant.

e.      Require the Company to provide reports setting forth relevant manager performance evaluation scores, isolating the scores for the EEO section of the performance evaluation, and setting forth any changes in compensation/bonus for each person.

f.      Require the Company to increase the portion of the restaurant's managers' compensation tied to achieving EEO and/or impose discipline on managers who are failing to comply with the spirit and terms of the decree.

g.      Require the Company to undertake remedial steps at the regional management level.

3.      In determining the appropriate remedial measures, the Diversity Monitor shall consider, among other things:

a.      The percentage and number of employees by which the restaurant failed to achieve its benchmark.

b.      Whether the restaurant failed to achieve its benchmark in preceding years, and if so by how much.

c.      Whether the failure to achieve the benchmark is part of any national, regional or local trend of failing to achieve benchmarks.

d.      Whether Applicant Flow at the restaurant(s) is increasing from year-to-year during the life of the Decree, using the data from the first half of 2007 as a point of comparison.

4.      The Diversity Monitor's determination shall become final and binding, and enforceable as though it were a Court order, if there is no appeal within 14 days from the date that the Diversity Monitor informs the Parties, in writing, of his determination.  If either party disagrees with the remedial measures ordered by the Diversity Monitor, that party may appeal the Diversity Monitor's decision to the District Court.  The Diversity Monitor's decision shall be reviewed under an "abuse of discretion" standard.

## XII.   REGISTRATION OF INTEREST

A.    Establishing Registration of Interest Program

1.    Within ninety (90) days of the Final Approval Date, the Company shall implement a  "Registration of Interest" program at each of its unit locations.  The program will be implemented to facilitate employees' expression of interest in both hourly and management-level positions.

2.    Each restaurant shall have a single bulletin board that contains postings as follows:

a.    On a monthly basis, the Company will post open positions at that location and other metropolitan area locations.  Employees will also be directed to the web-based job posting site for the most current listing of all open positions;

b.    Job descriptions for all positions (regardless of whether an opening currently exists); and

c.    Procedures for registering interest in any restaurant-level position (regardless of whether an opening currently exists), including a statement indicating that employees may use managers' computers to complete an online registration of interest form.

3.    Restaurant managers shall make their computers reasonably available for employees to complete registrations of interest, and shall work with the Regional EEO Managers to ensure that they learn of openings at all restaurants in the local metropolitan area, and post such openings as provided in Section 2(a), above.

4.    The Company shall establish and maintain a Registration of Interest database that contains all information entered by employees who register interest.  To the extent that an employee is selected for training or promotion for an open position, the Company shall maintain records of such training or promotion.  The employees' registrations of interest automatically shall be provided to managers making hiring decisions at all area restaurants and, upon request, to the Diversity Monitor.

5.      Employee training shall explain the company Registration of Interest and job posting/promotion policies.

B.      Front of the House and Back of the House (non-Exempt) Positions

1.      Employees who register interest in Front of the House and Back of the House (non-Exempt) position(s) and who meet the following conditions shall be considered applicants for any openings in such position in all area restaurants:

a.      The employee has served in his/her current position for six (6) months.

b.      The employee does not have any disability precluding him or her from fulfilling the essential job duties, even with an accommodation;

c.      For positions with a minimum age, the employee is of the required age.

d.      For positions for which any certification is required, the employee must have the requisite certification.

e.      The employee has had an on-time attendance rate of 95% over the preceding six months.

f.      The employee has not committed any violation of Company rules (other than attendance) resulting in formal written discipline within the prior six months.

g.      The employee has a level of English proficiency that is job related and consistent with business necessity.

2.      Nothing in this program should be construed to limit the Company's ability to promote employees in shorter timeframes than those set forth above, or the ability of employees to apply directly for openings in any restaurant.

C.      Management (Exempt) Positions

1.      An employee who registers interest in any management-level (exempt) position and who meets the following conditions shall be considered an applicant for any openings in such position in all area restaurants:

a.      The employee has been employed by the Company for 18 months, and for at least one year has held a position immediately subordinate to the management-level position sought.

b.      The employee does not have any disability precluding him or her from fulfilling the essential job duties, even with an accommodation;

c.      For positions with a minimum age, the employee is of the required age.

d.      For positions for which any certification is required, the employee must have the requisite certification.

e.      The employee has had an on-time attendance rate of 95% over the preceding three months;

f.      The employee has not committed any violation of Company rules (other than attendance) resulting in formal written discipline within the prior six months.

g.   The employee has a level of English proficiency that is job related and consistent with business necessity.

2.      Nothing in this program should be construed to limit the Company's ability to promote employees in shorter timeframes than those set forth above, or the ability of employees to apply directly for openings in any restaurant.

3.   Nothing in this program shall preclude the Company from conducting background checks that are job related and consistent with business necessity for persons being considered for management opportunities.

D.      Record Retention.  Registration of Interest forms and data regarding training and hiring via the Registration of Interest Program will be maintained for the Term of the Decree. For employees placed into management-level training, the Company shall maintain written documentation regarding the training for the Term the Decree.

**XIII.   SHIFT AND SECTION ASSIGNMENT AND COMPENSATION**

A.      The Company's annual Progress report (Section XVIII(D)) shall include, among other things, data regarding the compensation earned by the server, bartender, and host/hostess job categories by race at each restaurant.  If the Diversity Monitor finds that significant disparities exist in the compensation earned by African American and White employees in a restaurant, the Diversity Monitor shall investigate the cause of the disparities.  As part of any such investigation, the Diversity Monitor shall have access to Company data showing average base wages, average hourly compensation, and employee shift and table assignments at the restaurant level (including "covers" data demonstrating the number of customers at a table).

B.      If the Diversity Monitor's Report (Section XVIII(E)) concludes that there are significant pay disparities by race, and those disparities are due to Company compensation policies or practices (including shift or section assignment policies or practices), that have an adverse impact, or result from intentional discrimination, based on race, the Diversity Monitor will inform Class Counsel and counsel for the Company of the factual bases for the finding. Class Counsel and counsel for the Company shall meet and confer to determine appropriate remedial measures.  If they are unable to agree, Class Counsel and counsel for the Company shall present the dispute to the Diversity Monitor pursuant to the post-impasse Dispute Resolution Procedures (Section XX(C)).

**XIV.   MANAGER INCENTIVE TO PROMOTE DIVERSITY**

A.      The Company shall evaluate unit-level managers and regional managers, in part, on their degree of success in helping the Company to achieve its diversity goals (including achieving Restaurant Benchmarks, implementing the registration of interest program, and otherwise complying with the letter and spirit of this Decree).  The Company shall incorporate an evaluation of the manager's participation and performance in the Company's efforts to achieve its diversity goals and to implement the registration of interest program into the evaluation of each manager's bonus.  A meaningful portion of the manager's bonus shall be

based on EEO performance objectives established by the Company's Human Resources Department and consistent with this Decree.

B.      If the Company fails to meet one or more of its Company-wide Benchmarks, the Diversity Monitor may request that the Company provide it with reports setting forth manager bonus evaluation scores, isolating the scores for the EEO section of the bonus evaluation, and setting forth any changes in bonus for each manager in any restaurant that did not achieve its Restaurant Benchmark, or any Regional manager in any Region in which more than two Restaurants missed the Restaurant Benchmark.

## XV.    INTERNAL COMPLAINT SYSTEM

A.      Ethics Point.  The Company shall inform all employees that the Ethics Point complaint system provides a means by which employees can submit discrimination and EEO-related complaints, including complaints related to the Registration of Interest program and to shift and section assignments.  The Company shall integrate training on Ethics Point into training programs for new hires and existing employees.  The Company shall also post information about Ethics Point prominently on employee bulletin boards.  Employees will have the option of calling the Ethics Point hotline or submitting written complaints.

B.      Complaint Investigation.

1.      The Regional EEO Managers shall be in charge of investigating race discrimination complaints in their regions.  For each investigation, the EEO Manager shall document:

a.      the investigation steps taken (including naming witnesses interviewed, documents gathered, etc.);

b.      the outcome of the investigation; and

c.      the remedial measures taken (if any).

2.      These steps shall be followed for all race discrimination complaints, regardless of whether the underlying complaint is ultimately found to be meritorious.

3.      Employees who are not satisfied with the outcome of an Ethics Point race discrimination complaint shall have an opportunity to appeal directly to the Senior Official.

4.      The records of Ethics Point race discrimination complaints and follow-up investigations shall be maintained at the Company's corporate headquarters in Portland, Oregon for the Term of the Decree.  Summaries of Ethics Point investigation reports alleging race discrimination shall be appended to monitoring reports provided to Class Counsel.

## XVI.   RECRUITING

A.      The Company shall create a new position of Corporate Recruiter, who will be based in Portland, Oregon.  The Corporate Recruiter will undertake his or her Best Efforts to increase diversity in all Front of the House non-exempt positions and in all exempt positions.

B.      The Corporate Recruiter will work with Regional EEO Managers and Unit Managers at existing and new restaurants to increase the recruitment and hiring of African Americans.  This shall include 1) developing a list of recruitment and outreach sources, such as schools with high African American attendance levels, and job fairs attended by large numbers of African Americans, 2) developing a list of advertising media that have a large African American audience, and 3) advertising all job openings in outreach sources and media identified pursuant to subsections 1 and 2, above.  Within 180 days after the Final Approval Date, the Corporate Recruiter will provide the Diversity Monitor with all such lists, along with a summary of additional recruitment efforts and strategies undertaken.

C.      In the event that the African American Applicant Flow (as defined in Section XI(A)(1)) for any position in any restaurant declines for two consecutive years, the Company shall exercise its Best Efforts to increase the Applicant Flow to 1) the highest level recorded in any year for that position in that restaurant during the term of the Decree, or 2) the Applicant Flow for that position in that restaurant during the first half of 2007, whichever is higher.

D.      In the event that the Applicant Flow (as defined in Section XI(A)(1)) for any position in any restaurant in any year is lower than the Expected Representation of African Americans in the Labor Market (as defined in Section XI(A)(2)) for that position in that

restaurant in that year, the Company shall, within 30 days after the close of the next Reporting Period, develop a plan to increase the Applicant Flow percentage to at least the Expected Representation of African Americans.  The Company shall present that action plan to Class Counsel.  Class Counsel and the Company shall meet and confer about the plan.  If Class Counsel and the Company are not in agreement about the plan, they shall ask the Diversity Monitor to make a recommendation about an appropriate plan designed to increase Applicant Flow at the restaurant to at least the Expected Representation of African Americans in the Labor Market in that restaurant's Relevant Geographical Area (as defined in Section XI(A)(2)).  The Diversity Monitor's recommendation shall become final and binding, and enforceable as though it were a Court order, if there is no appeal within 14 days from the date that the Diversity Monitor informed the Parties of his recommendation.  If either party appeals the decision to the District Court, the Diversity Monitor's recommendation shall be reviewed under an "abuse of discretion" standard.

## XVII.  EMPLOYEE AND MANAGER TRAINING

A.      Employee Training.

1.      Not later than 180 days after the Final Approval Date, the Company shall provide to each of its restaurant-level employees a video presentation and written materials that:

a.      affirm the Company's commitment to diversity and equal employment opportunity; and

b.      explain the Registration of Interest Program and the methods for learning about other positions in the restaurant and job openings at all area restaurants; and

c.      explain the Company's Ethics Point complaint procedures.

2.      The video presentation shall also be provided to all restaurant level new hires within 30 days of their first day of work.

3.      A copy of the video and training materials shall be provided to Class Counsel.  At least once every two years during the term of the Decree, the Company shall provide a similar communication to each of its restaurant-level employees, after first providing a

copy of any new materials and reasonable opportunity for comment to Class Counsel.  The written communications will be signed and issued by the Chief Executive Officer of the Company.

       B.      Management Training.

          1.      In addition to the employee training set forth in Section XVII(A), the Company will provide an EEO and diversity training program for all exempt employees at the restaurant, regional, and executive levels.

          2.      The manager training will cover the issues included in the employee training set forth in Section XVII(A), but will provide more depth about complaint procedures and investigation, use of the Registration of Interest program, the recruitment provisions in the Decree, the Benchmark provisions in the Decree, the EEO Component of manager compensation, and other terms and conditions of this Decree.  The training will also include an interactive training module to help managers identify barriers that inhibit valuing race and ethnic diversity, understand why race and ethnic diversity awareness and acceptance is important to the Company's growth and future, and learn how race and ethnic stereotypes hinder effective communication and workplace interactions.  Such training shall not be provided solely through written materials.

          3.      No less than two hours shall be devoted to the training on these topics for all exempt employees within 180 days of the Final Approval Date, and every 24 months thereafter during the term of the Decree; provided, however, that if some topics covered by the training have been covered by training provided to exempt employees within the 18-month period prior to the Final Approval Date, the Company need not repeat training on such topics for those employees within 180 days of the Final Approval Date.  For all employees hired or promoted into exempt positions after the Final Approval Date, such training shall also be provided within 120 days of employment or promotion.

## XVIII.        REPORTING AND RECORDKEEPING

       A.      Documents to Be Preserved for the Term of the Decree

The Company shall retain the following employment-related records for the Term of the Decree or as required by state or federal law, whichever is longer:

      1.      A computer readable database or databases containing computerized payroll and personnel information for restaurant-level employees.  The payroll information contained in the database or databases shall include the information currently contained in the Company's payroll databases.  The personnel information shall include the job position and race of each employee.

      2.      Records showing each employee's shift and table assignments.

      3.      All versions of Registration of Interest Forms.

      4.      Registration of Interest records.

      5.      Records of the Company's recruitment efforts.

      6.      Job descriptions, including any changes to job descriptions.

      7.      Documentation of any validation studies performed on any employment requirements.

      8.      Copies of Ethics Point complaints regarding race discrimination, and documentation of investigations, findings and remedial measures taken.

      9.      Training documents and videos.

      10.      All documents expressly required to be created by this Decree.

Nothing in this Decree shall be interpreted to relieve the Company of any recordkeeping requirements otherwise imposed by applicable Federal or State law.

      B.      Access to Documents.  The Diversity Monitor will have access to all documents and information reasonably related to his/her responsibilities pursuant to the Decree.  The Diversity Monitor and Class Counsel shall, upon reasonable notice, be entitled to review all documents required to be maintained or created by the express terms of this Decree, except, however, that neither Class Counsel nor the Diversity Monitor shall be entitled to review any such documents that are protected by attorney-client or work product privilege.

      C.      Reporting Schedule.  The Company shall provide Progress Reports to the

Diversity Monitor and Class Counsel regarding the Company's compliance with the Decree's requirements 30 days after the close of the following reporting periods: 1) Months 1-12 after the Final Approval Date; 2) Months 13-24 after the Final Approval Date; 3) Months 25-36 after the Final Approval Date; 4) Months 37-48 after the Final Approval Date; and, if the Consent Decree has not been terminated pursuant to Section V(B), 5) Months 49-56 after the Final Approval Date.

        D.        Contents of the Company Progress Reports.  The Progress Reports shall include the following information:

        1.        A chart or charts displaying, for each Front of the House position in each restaurant, 1) the Applicant Flow, including the total number of applicants (as defined in Section XI(A)(1)), the total number who were African American (as defined in Section IIII(A)), and the resulting percentage; 2) the Expected Representation of African Americans in the Labor Market (as defined in Section XI(A)(2)); 3) the number of persons hired or promoted to fill that position at that restaurant during that year; and 4) the number and percentage of individuals hired or promoted to fill that position at that restaurant during that year who were African American.

        2.        A chart setting forth the Company-wide Benchmarks, and whether they were met, with respect to the percentage of persons hired or promoted into the position during the year.

        3.        A chart comparing the Applicant Flow (as defined in Section XI(A)(1)) for Front of the House positions at each restaurant for each year during the Term of the Decree, which shall include as an initial point of comparison the Applicant Flow from the first six months of 2007.

        4.        A chart or charts setting forth Registration of Interest records received, by race (African American and all others) and by job category, training provided based on Registration of Interest by race (African American and all others) and job category, and promotions made to individuals who used the Registration of Interest program by race (African

American and all others) and job category during the reporting year and for the Term of the Decree.

5.      A chart or charts setting forth average hourly wages, average weekly hours, and average compensation per hour for African American and White employees for each Front of the House position in each restaurant.

6.      A description of the implementation and delivery of the training required by Sections XVII, and lists of those in attendance.

7.      Summaries of Ethics Point complaints regarding a) race discrimination and race-based retaliation, b) the Registration of Interest Program, and/or c) section/shift assignments received during the year, including a summary of the nature of the complaint, the nature of the investigation that was undertaken, and the outcome.  Upon request, further documentation, including actual reports and investigation notes, shall be provided to the Diversity Monitor.

8.      Certification by the Senior Official that she or he has used Best efforts to see that the Consent Decree is implemented.

9.      The first Progress Report shall also contain a statement setting forth the qualifications for each restaurant position; subsequent Reports shall set forth any changes made to such qualifications.

10.     The final Progress Report shall also include a chart comparing the number of African American, White and all other employees in Front of the House positions at each restaurant for each year during the Term of the Decree, which shall include as an initial point of comparison the number of African Americans, White and all other employees in Front of the House positions as of year-end 2006.

E.      Diversity Monitor Reports

1.      Upon receipt of the Company's Progress Report, the Diversity Monitor shall review the Report and identify any potential or actual failures to achieve benchmarks or to use Best Efforts, and conduct any investigation required by this Decree.

2.      Within 90 days after the Company's first four Progress Reports, and within 45 days after the Company's fifth progress report, the Diversity Monitor shall issue a report to Class Counsel and the Company setting forth:

a.      Whether the Diversity Monitor has found that the Company achieved its Company-wide Benchmarks.  If the Diversity Monitor has found that the Company failed to achieve any Company-wide Benchmark, the Report shall specify:

i.      which Company-wide Benchmark(s) were missed and the individual restaurant(s) that missed the restaurant benchmark;

ii.      what investigation the Diversity Monitor undertook to determine the cause of the failure(s);

iii.       the Diversity' Monitor's findings regarding the cause of the failure(s) to achieve the benchmark(s); and

iv.      the Diversity Monitor's recommendation regarding remedial measures to be taken.

b.      Whether the Diversity Monitor has found that Applicant Flow for any position in any restaurant has declined for two consecutive years.  If so, the Diversity Monitor's report shall specify:

i.      what investigation the Diversity Monitor undertook to determine the cause of the failure(s) with respect to Applicant Flow;

ii.      whether the Diversity Monitor has found that the Company or any restaurant or company employee failed to use Best Efforts to recruit African American applicants; and

iii.      the Diversity Monitor's recommendation regarding remedial measures to be taken.

c.      Whether the Diversity Monitor found that any significant racial disparities exist in the average hourly wages earned by the three benchmark job categories at each restaurant.  If the Diversity Monitor finds significant racial disparities, the Report shall specify:

i.      what investigation the Diversity Monitor undertook to determine the cause of the disparities;

ii.     the Diversity' Monitor's findings regarding the cause of the disparities; and

iii.    the Diversity Monitor's recommendation regarding remedial measures to be taken.

d.      Any other matters that the Diversity Monitor believes are necessary in order to implement the letter and spirit of this Decree.

F.      Parties to Meet and Confer.   If the Diversity Monitor has made any finding that the Company has failed to use Best Efforts to effectuate any requirement of this Decree, the parties shall, within 30 days of receipt of the Diversity Monitor's Report, meet and confer to discuss appropriate remedial measures to be taken, if any.  If the parties are unable to reach agreement at such meet and confer session, either Party may invoke the post-impasse Dispute Resolution procedures set forth in Section XX(C).

## XIX.  COMPLIANCE REPORT TO THE COURT

At any time during the operation of the Decree, Class Counsel or the Diversity Monitor may request that a Compliance Hearing be held before the Court.  Class Counsel shall provide four weeks' notice to the Company and the Diversity Monitor before making any such request. The Diversity Monitor shall provide four weeks' notice to Class Counsel and the Company before making any such request.

Either Class Counsel or the Diversity Monitor can also file a written report with the Court, including a report updating the Court on the status of Decree compliance.  Class Counsel or the Diversity Monitor shall give counsel for the Company two weeks' notice before filing

such a report.  Counsel for the Company may add a supplement to the report, or file its own report.

## XX.    DISPUTE RESOLUTION AND ENFORCEMENT PROCEDURES

     A.    General.

        1.    The Diversity Monitor shall have authority to resolve all disputes arising under the Decree, subject to limitations and standards set forth in the Decree.

        2.    At the request of Class Counsel or the Company, the parties shall use Best Efforts to resolve promptly any differences or any disputes regarding the interpretation or implementation of the Consent Decree.

        3.    Class Counsel or the Company shall have the right to initiate steps to resolve any dispute or issue of compliance regarding any provision of the Decree subject to limitations and standards set forth in the Decree.

     B.    Initial Dispute Resolution Procedures.

        1.    If Class Counsel or the Company has good reason to believe that a legitimate dispute exists, the initiating party shall first promptly give written notice to the other party including:  (a) a reference to all specific provisions of the Decree that are involved; (b) a statement of the issue; (c) a statement of the remedial action sought by the initiating party; and (d) a brief statement of the specific facts, circumstances and any other argument supporting the position of the initiating party;

        2.    Within twenty one (21) days after receiving such notice, the non-initiating party shall respond in writing to the statement of facts and arguments set forth in the notice and shall provide its written position, including the facts and arguments upon which it relies in support of its position;

        3.    Class Counsel and the Company shall undertake good-faith negotiations, including meeting or conferring by telephone or in person and exchanging relevant documents and/or other information, to attempt to resolve the issues in dispute or alleged noncompliance;

     C.    Post-Impasse Dispute Resolution Procedures.

1.      The Diversity Monitor, upon motion, may permit Class Counsel or the Company to take post-settlement discovery as provided by the Federal Rules of Civil Procedure, but only as to matters relevant to the underlying claim of breach, if the Diversity Monitor determines that the informal exchange of documents or information has not been sufficient to allow Class Counsel or the Company to present the dispute upon a factual record adequate for a fair determination of the issue.

2.      If the parties' good-faith efforts to resolve the matter have failed, and after written notice of an impasse by the moving party to the non-initiating party or parties, Class Counsel or the Company may file a motion with the Diversity Monitor, with a supporting brief, requesting resolution of the dispute or the issues of non-compliance, provided however, that such motion shall be limited to the dispute(s) and/or issue(s) as to which the parties have met and conferred as described in this Section.

3.      The non-moving parties will have fifteen (15) days to respond to any such motions.

4.      The Diversity Monitor shall attempt within fifteen (15) days after filing of the final brief to resolve the dispute and may schedule a hearing or other proceeding, including an evidentiary hearing, to resolve the matter.

5.      Within thirty (30) days of any hearing, the Diversity Monitor shall issue a written determination, including findings of fact if requested by any Party.

6.      The Diversity Monitor's determination shall become final and binding, and enforceable as though it were a Court order, if there is no appeal within 14 days from the date that the Diversity Monitor informed the Parties of his determination.

7.      Class Counsel or the Company may appeal a decision of the Diversity Monitor to the Court provided that such an appeal is made within fourteen (14) days of receipt of notice of the decision by the Diversity Monitor.  Any such appeal shall be brought by motion under the Local Rules of the Court and Federal Rules of Civil Procedure.  The decision rendered by the Diversity Monitor shall be affirmed unless the Court determines that the Diversity

Monitor's decision was an abuse of discretion under the Consent Decree.  A party may seek on appeal any remedy provided by law, provided that such remedy is consistent with the provisions of this Decree.

        8.      Only Class Counsel or the Company shall have standing to move the Court to enforce, apply, or modify this Decree.  Any individual concerned about the Company's compliance with this Decree may so notify Class Counsel or the Diversity Monitor and request that they examine the Company compliance and seek such relief, if any, as may be appropriate.

        9.      In the event that any party seeks to use the dispute resolution procedure set forth in Section XX, then each party shall bear its own attorneys' fees, costs and expenses for all work performed through resolution by the Diversity Monitor.  In the event that any party seeks to appeal any decision of the Diversity Monitor, then the prevailing party in such matter shall be entitled to recover reasonable attorneys' fees, costs and expenses incurred in such appeal from the other party, consistent with applicable standards under Title VII.  Whether and to what extent any party is a prevailing party entitled to an award of fees and expenses shall be determined in the sole and absolute discretion of the Court.  For purposes of this Section, Class Counsel shall be deemed a "party" to any enforcement proceedings.

       10.      The provisions of this Section do not prevent Class Counsel or the Company from promptly bringing an issue directly before the Court when exigent facts or circumstances require immediate Court action to prevent a serious violation of the terms of this Decree, which otherwise would be without meaningful remedy.  The moving papers shall explain the facts and circumstances that allegedly necessitate immediate action by the Court. Absent a showing of exigent facts or circumstances, the Court shall refer the matter to the Diversity Monitor to resolve in accordance with procedures set forth above.  If any such matter is brought before the Court requesting immediate action, the other party shall be provided with appropriate actual notice, and an opportunity to be heard on the motion, under the Local Rules of the Court and the Federal Rules of Civil Procedure.  The Court in its discretion may set such

procedures for emergency consideration as are appropriate to the particular facts or circumstances, but no such matter may be heard or considered on an ex parte basis.

11.     The dispute resolution provisions set forth in Section XX are not intended to be an exclusive mechanism for resolution of complaints of discrimination by the Company. The Company's employees complaining of violations of state and/or federal law prohibiting discrimination in employment may use the Company's internal complaint procedure or may file charges with the EEOC, or the state or local fair employment agency, even where such violations, if proven, might also constitute violations of the provisions in this Consent Decree. Individual complaints for such alleged violations, as distinguished from pattern or practice allegations, shall not be considered to raise an issue of compliance or non-compliance with this Decree.

## XXI.  MONETARY RELIEF, NOTICE AND CLAIMS PROCEDURE

A.      The Claims Administrator will open and administer an interest-bearing Qualified Settlement Fund account ("QSF") with a unique Tax Payer Identification Number.  Within five (5) business days after the Preliminary Approval Date, the Company shall pay $2.1 million into the QSF for the purpose of providing individual monetary awards to the Class Representative and other eligible members of the Settlement Class pursuant to Sections XXI(D)(1), payment of one half of the employer's share of payroll taxes pursuant to Section XXVII(C)(2), payment of the employees' share of payroll taxes pursuant to Section XXVII(C)(2), payment of attorneys' fees, litigation expenses, and costs, as provided in Section XXI(D)(3), service payment for Class Representative Juanita Wynne, pursuant to Section XXI(D)(2), separate payment to Dante Byrd and Juanita Wynne for release of their non-class claims, pursuant to Section XXI(D)(4), and claims administration and monitoring of the Decree, as provided in Section XXI(D)(5).

B.      After the Settlement Effective Date, and within seven business days after the Claims Administrator has informed the Company in writing that it is prepared to distribute monetary awards to the eligible members of the Settlement Class, the Company will also wire to

the QSF one half of the employer's share of all applicable payroll taxes on amounts treated as wages.

      C.      Nothing herein shall be deemed to require the Company to separate or segregate its assets into a restricted fund. The QSF will be created, managed and disbursed by the Claims Administrator under the supervision of Class Counsel.  The Company will have no responsibilities or liabilities with respect to the QSF, its administration, or distributions therefrom.

      D.      Distribution of QSF Funds.

      1.      Payments to Settlement Class members.  The Claims Administrator will distribute $1.1 million from the QSF, less any amount awarded by the Court for the payment of a Service Award, less one half of the employer's share of payroll taxes on amounts designated as wages, less the employees' share of payroll taxes on amounts designated as wages, and less appropriate withholdings from amounts designated as wages, as set forth in Section XXVII(C)(2), to eligible members of the Settlement Class according to the Distribution Formula.

      2.      Service Award.  The Claims Administrator will distribute a Service Award in the amount of $5,000, or such amount as is approved by the Court, not to exceed $5,000, to Class Representative Juanita Wynne.  This amount will compensate Juanita Wynne in consideration for the time and effort she expended in these proceedings, including providing information and assistance in prosecuting and settling this action, responding to written discovery and document requests, and preparing for and submitting to deposition.  Payment of the Court-approved service payment shall be made from the QSF no later than (7) business days after the Settlement Effective Date or the issuance of a court order approving the Motion for Service Payments, whichever is later.  This amount shall not be deemed wages, and the Claims Administrator shall issue a form 1099 for this amount.   The amount of the service payment, if any, shall be in addition to any amount Ms. Wynne is eligible to receive pursuant to this Consent Decree as a member of the Settlement Class and for waiver of her non-class claims.

3.     Attorneys' Fees and costs.  The Claims Administrator will distribute $900,000, or such amount as is approved by the Court, to Class Counsel for work they performed and costs they expended through the date of final settlement approval.   This amount fully satisfies any statutory obligation the Company may have, or might incur, to pay attorneys' fees, litigation expenses, and costs for and on behalf of the Plaintiffs, the Class Representative and Settlement Class for any and all work performed and costs and expenses incurred through and including the Final Approval Date.  The Claims Administrator will wire from the QSF to Class Counsel the amount of Court-approved attorneys' fees, litigation expenses, and costs for the period prior to Final Approval within seven (7) business days after the Settlement Effective Date or the issuance of a court order approving Class Counsel's attorneys' fees, litigation expenses, and costs, whichever is later.

4.     Named Plaintiffs Dante Byrd and Juanita Wynne.  The Company has agreed to pay $5,000 each to named plaintiffs Dante Byrd and Juanita Wynne to settle any and all claims arising out of their application for employment or employment with McCormick & Schmick's, including, for Ms. Wynne, a release of any non-class claims for race harassment/hostile work environment, and, for Mr. Byrd, a release of any non-class claims arising out of his application for employment with McCormick & Schmick's.  The Claims Administrator shall pay these amounts from the QSF within seven (7) business days after the Settlement Effective date.  The payment to Ms. Wynne pursuant to this subsection shall be in addition to the amount of the service payment, if any, that the Court approves and the amount that Ms. Wynne is eligible to receive pursuant to this Consent Decree as a member of the Settlement Class.  Mr. Byrd is not a class member and is not eligible to receive any other payment pursuant to this Consent Decree, including any service payment.

5.     Administration and Monitoring Fund.  The Claims Administrator shall allocate $90,000, plus all interest earned on moneys in the QSF, plus any amount from uncashed checks pursuant to XXVII(E), as an Administration and Monitoring Fund.

a.      The Administration and Monitoring Fund shall be used to pay the expenses of the Claims Administrator pursuant to Section XXIV(D), the fees and expenses of the Diversity Monitor pursuant to Section XXVIII, the attorneys' fees and expenses of Class Counsel incurred in implementing and monitoring the Decree pursuant to Section XXIX(A), and any taxes owing on any net income of the Qualified Settlement Fund.

b.   If there are insufficient funds in the Administration and Monitoring Fund, the other items listed in XXI(D)(5)(a) will be given priority over payment to Class Counsel.  If the Administration and Monitoring Fund has enough money to cover all of the items listed in XXI(D)(5)(a), Class Counsel will receive its full hourly rate for its monitoring work. Consent Decree Section XXIX(A).

c.   If there is any amount remaining in the Administration and Monitoring Fund after the Decree has terminated and all outstanding bills pursuant to subsection a (above) have been paid, Class Counsel may apply to the Court for an award of such remaining amount 1) as compensation for work performed prior to the Final Approval Date that was not compensated as part of the proposed $900,000 attorneys' fee award, and 2) as compensation for having undertaken the risk that the Administration and Monitoring Fund would not have sufficient funds to compensate Class Counsel for work performed in implementing and monitoring the Decree. In the event that the Court does not approve payment of the full amount to Class Counsel, the remaining amount shall be distributed as follows:

i.   If the amount is $50,000 or more, the funds shall be distributed (less claims administration costs) on a pro-rata basis to class members who submitted timely and valid claim forms;

ii.  If the amount is less than $50,000, the funds shall be distributed to a charity mutually agreed-upon by the parties.

## XXII.  NOTICE TO CLASS

A.      Within twenty (20) days following the Preliminary Approval Date, McCormick &
Schmick's shall provide the Claims Administrator with a computer disk containing the full
name, social security number, last known address and phone number, position(s) held during the
class period, start date during the class period, and, as applicable, end date of employment for
each position held during the class period, for all employees employed by McCormick &
Schmick's through the Preliminary Approval Date who are potential Settlement Class members.

B.      Upon receipt of the computer disc, the Claims Administrator will update the
addresses of employees provided by McCormick & Schmick's through the National Change of
Address ("NCOA") system.

C.      Within ten (10) days of the date that the Claims Administrator receives the data
described in Section XXII(A), the Claims Administrator shall mail, via first class postage, pre-
printed Notices of Class Settlement and Claim Forms, all in the form approved by the Court in
the Preliminary Approval Order, to all known potential Settlement Class members at their last
known address or at the most recent address that may have been obtained through the NCOA.

D.      The Claims Administrator will trace all returned undeliverable notices and re-mail
to the most recent address available.

## XXIII.        OBJECTIONS AND OPT OUTS

Class members may object to or opt-out of the class settlement.

A.      Objections.  Class members objecting to the terms of the settlement must do so in
writing; the written objection must be sent to the Claims Administrator postmarked on or before
the date specified in the Preliminary Approval Order.  The Claims Administrator will record the
date of receipt of the objection and forward it, by e-mail as a PDF attachment, to both
McCormick & Schmick's and Class Counsel within two (2) business days following receipt.
Class Counsel will file the original objections with the Clerk of the Court no later than five (5)
days prior to the scheduled Fairness Hearing date.  The Claims Administrator shall retain copies

of all written objections until such time as it has completed its duties and responsibilities under this Decree.

        B.      Opt-Outs.

        1.      Class members may exclude themselves, or opt-out, of the monetary relief provisions of the class settlement.  Any request for exclusion must be in the form of a written "opt-out" statement sent to the Claims Administrator postmarked on or before the date specified in the Preliminary Approval Order.  Information on how to opt-out of the settlement shall be made available by the Claims Administrator.  A person wishing to opt-out must sign and date a statement which includes the following language:

> I understand that I am requesting to be excluded from the class monetary settlement and that I will receive no money from the settlement fund created under the Consent Decree entered into by McCormick & Schmick's.  I understand that if I am excluded from the class monetary settlement, I may bring a separate legal action seeking damages, but may receive nothing or less than what I would have received if I had filed a claim under the class monetary settlement procedure in this case.  I also understand that I may not seek exclusion from the class for injunctive relief and that I am bound by the injunctive provisions of the Consent Decree entered into by McCormick & Schmick's.

        2.      The Claims Administrator shall date stamp the original of any Opt-out statement and serve copies on both McCormick & Schmick's and Class Counsel by email as a PDF attachment within two (2) business days of receipt of such statement.  Class Counsel will file a list of timely opt outs with the Clerk of the Court no later than five (5) days prior to the scheduled Fairness Hearing date.  The Claims Administrator shall not include in the filing with the Court the Opt Out Statements of those class members who submitted complete and timely Opt Out Rescission statements.  The Claims Administrator shall retain copies of all Opt-out statements until such time as it has completed its duties and responsibilities under this Decree.

        C.      Rescission of Class Member Opt-Outs.

        1.      The parties recognize that some class members who initially submit Opt-out statements seeking exclusion may, upon further reflection, wish to withdraw or rescind such

Opt-out statements.  The parties agree that class members shall be permitted to withdraw or rescind their Opt-out statements by submitting a "Rescission of Opt-out" statement to the Claims Administrator.  The Rescission of Opt-out statement shall include the following language:

> I previously submitted an Opt-out statement seeking exclusion from the class monetary settlement.  I have reconsidered and wish to withdraw my Opt-out statement.  I understand that by rescinding my Opt-out I may be eligible to receive an award from the claims settlement fund and may not bring a separate legal action against McCormick & Schmick's seeking damages with respect to the Released Claims.  I further understand that in order to receive an award from the claims settlement fund, I must submit a complete and timely claim form.

2.      A class member submitting such a rescission statement shall sign and date the statement and send it to the Claims Administrator postmarked no later than the deadline for the claims filing period specified in the Preliminary Approval Order.

3.      The Claims Administrator shall stamp the date received on the original of any Rescission of Opt-out statement and serve copies to counsel for McCormick & Schmick's and Class Counsel by email as a PDF attachment no later than (2) days after receipt thereof.  Class Counsel will file the date-stamped originals with the Clerk of the Court no later than five (5) business days prior to the date of the Fairness Hearing.  The Claims Administrator shall retain copies of all Rescissions of Opt-out statements until such time as the Claims Administrator is relieved of its duties and responsibilities under this Decree.

4.      McCormick & Schmick's shall have the unilateral right to revoke the Consent Decree prior to the Settlement Effective Date if five percent (5%) or more of the Class Members opt-out of the monetary relief provisions of the Consent Decree and do not rescind their opt-out statements.  If McCormick & Schmick's exercises its unilateral right to revoke the Consent Decree pursuant to this section, it shall inform Class Counsel within ten business days after the deadline for postmarking opt out statements.  In the event that McCormick & Schmick's exercises its unilateral right to revoke the Consent Decree pursuant to this section, all monies in

the QSF, and all income earned thereon, shall be immediately returned to the entity that funded the QSF.

## XXIV.        CLAIMS ADMINISTRATION

A.       The Claims Administrator shall (1) prepare and mail settlement notices and claim forms to class members;  (2) receive and evaluate claims eligibility; (3) seek additional information from claimants, when appropriate; (4) receive, serve, and file opt-out statements, rescission of opt-out statements, and objections; (5) respond to questions from potential class members; (6) implement the allocation plan; (7) maintain a toll-free number for communicating with class members; (8) establish and operate a website designed to provide information to and communication with class members; (9) administer the QSF and the Administration and Monitoring Fund; and (10) perform any other duties necessary to carry out its responsibilities set forth in this Decree.

B.       The Claims Administrator shall make notices and claim forms available to potential class members who submit oral, e-mail, or written requests for notices or claim forms. If a potential class member requests that a notice or claim form be sent by mail, the Claims Administrator shall mail the requested notice or claim form via first class mail within one (1) business day after receiving a request.  If a potential class member requests a notice or claim form to be sent by email or fax, the Claims Administrator shall email or fax the requested notice or claim form within (1) business day after receiving a request.

C.       If McCormick & Schmick's, or its counsel, receives requests for notices, claim forms or for information regarding the class settlement, it shall refer such requestors to the toll-free number established by the Claims Administrator for the purpose of administering this settlement.  The requestors shall be informed that any requests for notices, claim forms or information should be directed to the Claims Administrator.  The Claims Administrator shall retain copies of all written requests for notices, claim forms and all records of oral or e-mail requests for notices or claim forms until such time as it has completed its duties and responsibilities under this Decree.

D.     The fees, costs, and expenses of the Claims Administrator shall be paid from the Administration and Monitoring Fund, established pursuant to XXI(D)(5).  The Claims Administrator shall forward to Class Counsel invoices for work performed pursuant to this Decree.  Unless Class Counsel objects, the Administration and Monitoring Fund shall pay the Claims Administrator the amount invoiced 30 days after the date of the invoice.

Class Counsel reserves the right to challenge bills of the Claims Administrator if the amount of time billed is excessive for the work performed.  Such challenges will be reviewed by the Court.

## XXV.  SUBMISSION OF CLAIM FORMS

A.     To be eligible for payment of a monetary award from the QSF, an individual must:

1.     Complete a claim form signed under penalty of perjury and send it to the Claims Administrator postmarked by the claim filing deadline set forth in the Preliminary Approval Order.  The claim form must be postmarked on or before such date in order to be considered timely, unless good cause is shown for failure to have such timely postmark.  All claim forms must be signed under penalty of perjury to be considered.

2.     Provide her or his full name, current address, current social security number, and other name(s) used while applying for or being employed by McCormick & Schmick's; and

3.     State that she or he is African American or Black, or is more than one race, one of which is African American or Black.

B.     The Claims Administrator shall be available through the toll-free telephone number and via e-mail through the Claims Website to respond to requests from class members for assistance in completing and filing claim forms.  Class Counsel shall also be available to consult with and provide assistance to potential class members who request assistance in completing their claims forms.

**XXVI.      REVIEW OF CLAIM FORMS**

A.      Incomplete Claim Forms.  The Claims Administrator shall make the determination as to whether a claim form is complete.  If it is not complete, the Claims Administrator shall, within seven (7) days of receipt of the claim form, request additional information from the claimant, if it appears that such additional information would complete the Claim Form.  Such requests for information shall be in writing and shall specify the information necessary to complete the claim form.  The request for information will be sent via first class mail and inform the claimant that a response must be returned no later than thirty days from the date the request for information was mailed.  The claimant must provide the requested information, signed under penalty of perjury, to the Claims Administrator by mail with a postmark no later than thirty days from the date of the mailed request for information.  Such additional information shall be considered part of the original claim form and will relate back to the original filing date.  The failure of a claimant to timely respond to the request for information may result in the denial of the claim.

B.      Deceased Claimants.  Claims may be filed by deceased claimants through representatives of their estate if a photocopy of a death certificate and a statement of representation is included with the claim form.  Claim payments shall be made payable to the estate of the deceased claimant.

C.      Late-Filed Claims.  For claims received after the filing deadline, the Claims Administrator shall notify late-fling claimants that their claims are untimely and that they are not eligible for any monetary award, unless the Court determines that the Claimant has established good cause for filing late, and that accepting the untimely claim form will not delay the Settlement Effective Date or the distribution of funds pursuant to this Consent Decree.

D.      Appeals of Claims Eligibility.

1.      Within ninety (90) days of the close of the claims filing period, the Claims Administrator shall provide written notice to inform all ineligible claimants of their ineligibility for monetary relief.  Any claimants wishing to seek review of their ineligibility determinations

must do so by returning a written request for review to the Claims Administrator by mail with a postmark no later than twenty-one days from the date of the notice of claim ineligibility.  Failure to file a timely request for review shall bar a claimant from challenging a determination of ineligibility.

        2.    The Claims Administrator shall resolve the requests for review based on the written request for review and any other documentation or written information submitted by the claimant, or deemed necessary by the Claims Administrator.  The Claims Administrator may seek further written information from the claimant as to the basis of their request and may consider the written arguments of counsel for McCormick's.

        3.    The Claims Administrator shall attempt to expeditiously resolve any request for review within sixty days after the filing of the request for review.  The Claims Administrator's decisions shall be communicated to the claimant in writing and shall be final, binding and non-appealable.

        E.    Claimant Information Provided by McCormick & Schmick's

The parties understand and agree that McCormick & Schmick's may possess information that may assist in the determination of eligibility of potential class members for monetary compensation.  McCormick & Schmick's shall reasonably cooperate in providing such information which Class Counsel or the Claims Administrator deems reasonably necessary to assist in determining the eligibility of any class member for monetary relief.  McCormick & Schmick's shall attempt to provide such information within fourteen days of any written request for the information.  Neither Class Counsel nor the Claims Administrator shall be entitled to receive information that is protected by attorney-client or work product privilege.

        F.    Confirmation of Receipt of Claim Form

The Claims Administrator website shall provide a means for class members to obtain confirmation of receipt of their claim forms.  In addition, the Claims Administrator shall respond to all requests from class member for confirmation of receipt of claims forms.

XXVII.    PLAN OF ALLOCATION

    A.    Distribution Formula.

    1.    Each eligible class member shall receive 1 point for each full pay period worked in any Front of the House position, and 3 points for each full pay period worked in any Back of the House position.

    2.    Sixty (60) days after the claims filing deadline, the Claims Administrator shall total the points applicable to all eligible claimants, determine each eligible claimant's proportionate share of the total points, and allocate each eligible claimant's proportionate share of the Settlement.  Once this formula is completed, the Claims Administrator shall inform Class Counsel and the Company that it has completed the calculations required by the Plan of Distribution.

    B.    Allocation of Monetary Awards.  The monetary awards shall be allocated to lost wages, compensatory damages, and interest, with 30% allocated to lost wages, 50% allocated to compensatory damages, and 20% allocated to interest.

    C.    Distribution of the Monetary Awards.

    1.    As soon as practicable after 1) the Settlement Effective Date and 2) making the calculations required by the allocation plan set forth in Section XXVII(A), above, the Claims Administrator shall distribute the monetary awards to eligible class members via first class mail.  The checks shall be invalid if not cashed within 180 days of the issue date.

    2.    Any amounts allocated to lost wages shall be subject to withholding for federal and state income and payroll taxes.  Each Class Member will be responsible for all income taxes on his or her monetary award, and the Company shall be responsible for one half of the employer's share of all applicable payroll taxes.  The Claims Administrator will inform McCormick & Schmick's of the amount that is one half of the employer's share of the payroll taxes, and the Company shall pay such amount as provided in Section XXI(B).  Any amounts designated as interest shall not be subject to withholding and shall be reported, if required, to the

IRS on Form 1099-INT.  The amounts paid for emotional distress shall not be subject to withholding and shall be reported to the IRS on Form 1099-MISC.

3.      Included with the check due to the eligible claimant will be a statement showing the gross amount of the payment and an itemized statement of all deductions made. Flat rate deductions from gross amounts that are determined to be wage payments will be made for federal and state income taxes.  The employee's share of social security and Medicare tax, and any local income or payroll taxes will be based on the rates in effect with the federal and local governments.

4.      The Claims Administrator will be responsible for preparing the filing of all appropriate tax filings and reports including, but not limited to, W-2 and 1099 forms for all eligible claimants and the Class Representative for their payments from the QSF, as well as any required for the QSF.  The Claims Administrator will also be responsible for reporting and remitting to the appropriate taxing authorities the employer's and employees' shares of payroll taxes.

D.      Confidentiality of Claimant Information.  McCormick & Schmick's counsel and payroll department will only be provided with the names and social security numbers of class members who filed claims on a need-to-know basis.  The identity of the claimants will not be disclosed to McCormick Restaurant management.

E.      Use of Residual Funds from Uncashed Checks.  It is the intention of the parties to distribute completely the funds in the QSF.  The Claims Administrator will use social security numbers to attempt to get better addresses for any class members whose checks are returned, and will remail the uncashed checks to the new addresses.  The Claims Administrator will also attempt to telephone any class member who has not cashed a check of at least $1,000.  If, despite those efforts, checks remain uncashed after they have become invalid, the remaining sum shall be paid to the Administration and Monitoring Fund.

F.       Report from Claims Administrator.  Within thirty days of the distribution of the monies from the QSF to the eligible Class members, the Claims Administrator shall furnish an

accounting of the distributions from the QSF to the Court with copies to Class Counsel and McCormick & Schmick's.  Within thirty days of the completion of the Term of the Decree the Claims Administrator shall furnish a final accounting of all the distribution from the QSF to the Court, Class Counsel and McCormick & Schmick's.

**XXVIII.      DIVERSITY MONITOR FEES AND EXPENSES**

The Diversity Monitor shall be compensated exclusively from the Administration and Monitoring Fund for reasonable time billed and expenses incurred in connection with performing his duties under this decree.  The Diversity Monitor will receive payment on the basis of his or her standard hourly rate of $650 (and reasonable annual increases) and reimbursement for out-of-pocket expenses, thirty days after submitting to the Administration and Monitoring Fund and Class Counsel a bill including an itemized statement of time spent and work performed and expenses and costs incurred.

Class Counsel reserves the right to challenge bills of the Diversity Monitor if the amount of time billed is excessive for the work performed.  Such challenges will be reviewed by the Court.

**XXIX.      POST-APPROVAL ATTORNEYS' FEES AND EXPENSES**

A.      In addition to the amount paid for attorneys' fees and expenses through the Final Approval Date pursuant Section XXI(D)(3), Class Counsel may be awarded their reasonable attorneys' fees, litigation expenses, and costs for work required to be performed by Class Counsel after the Final Approval Date pursuant to this Decree, subject to the limits of the Administration and Monitoring Fund.  Said attorneys' fees, expenses and costs shall be paid exclusively from the Administration and Monitoring Fund.  Class Counsel will receive payment on the basis of his or her standard hourly rates (set forth in Appendix 1 hereto, plus reasonable annual increases) and reimbursement for out-of-pocket expenses, thirty days after submitting to the Administration and Monitoring Fund a bill including an itemized statement of time spent and work performed and expenses and costs incurred.

B.      In addition to the foregoing amounts, the Company agrees that in the event that

the Company or any of its officers, managers or supervisors is held in contempt violation of this Decree, Class Counsel shall be paid their reasonable costs, expenses and attorneys' fees for the enforcement proceedings resulting in the contempt holding, as though the Class Representative then were a prevailing party in Title VII litigation, based on extent to which counsel prevailed.

## XXX.  MISCELLANEOUS PROVISIONS

      A.      Modification and Severability of the Consent Decree.

      1.      Whenever possible, each provision and term of this Decree shall be interpreted in such a manner as to be valid and enforceable; provided, however, that in the event that after Final Approval hereof any provision or term of this Decree should be determined to be or rendered unenforceable on collateral review, all other provisions and terms of this Decree and the application thereof to all persons and circumstances subject thereto shall remain unaffected to the extent permitted by law.  If any application of any term of this Decree to any specific person or circumstance should be determined to be invalid or unenforceable, the application of such provision or term to other persons or circumstances shall remain unaffected to the extent permitted by law.

      2.      Class Counsel and the Company may jointly agree to modify the Decree in writing signed by both Class Counsel and the Company.

      3.      In the event that changed or other circumstances make a modification of the Decree necessary to ensure its purposes are fully effectuated, but good faith negotiations seeking such modifications are unsuccessful, any party to the Decree shall have the right to move the Court to modify this Decree.  Such motion shall be granted only upon the movant proving to the Court by clear and convincing evidence that changed or other circumstances make such modification necessary.  The procedures for negotiations to modify this Decree shall be the same as those set forth in Section XX regarding Decree enforcement.

      B.      Duty to Support and Defend the Decree.  Class Representative, Class Counsel, and the Company each agree to abide by all the terms of this Decree in good faith and to support

it fully, and shall use Best Efforts to defend this Decree from any legal challenge, whether by appeal or collateral attack.

       C.      Failure to obtain final approval of Consent Decree.  In the event that this Consent Decree does not become final and effective in its current form, for whatever reason, this entire Consent Decree shall become null and void and of no force or effect.

       D.      Execution in Counterparts.  The parties agree that the Decree may be executed in counterparts, each of which shall be deemed to be an original and all of which together shall be deemed to be part of the same Decree.

       IT IS SO ORDERED, ADJUDGED AND DECREED this 8th day of August, 2008.

_____
Hon. Claudia Wilken
United States District Judge
Northern District of California

**STIPULATED, ACKNOWLEDGED AND AGREED TO BY:**

**CLASS COUNSEL**

| | |
|---|---|
| James M. Finberg (SBN 114850)<br>Eve H. Cervantez (SB 164709)<br>Rebekah B. Evenson (SBN 207825)<br>ALTSHULER BERZON LLP<br>177 Post Street, Suite 300<br>San Francisco, CA 94108<br>Telephone: (415) 421-7151<br>Facsimile: (415) 362-8064<br>E-Mail: jfinberg@altshulerberzon.com<br>E-Mail: ecervantez@altshulerberzon.com | Kelly M. Dermody (SBN 171716)<br>Jahan C. Sagafi (SBN 224887)<br>LIEFF, CABRASER, HEIMANN &<br>   BERNSTEIN, LLP<br>275 Battery Street, 30th Floor<br>San Francisco, CA 94111-3339<br>Telephone: (415) 956-1000<br>Facsimile: (415) 956-1008<br>E-Mail: kdermody@lchb.com<br>E-Mail: jsagafi@lchb.com |
| Robert Rubin (SBN 085084)<br>THE LAWYERS' COMMITTEE FOR<br>CIVIL RIGHTS OF THE SAN FRANCISCO<br>BAY AREA<br>131 Steuart Street, Suite 400<br>San Francisco, CA 94105<br>Telephone (415) 543-9444<br>Facsimile: (415) 543-0296<br>E-Mail: rrubin@lccr.com | Thomas A. Warren<br>THOMAS A. WARREN LAW<br>OFFICES<br>2032 Thomasville Rd #D<br>Tallahassee, FL 32308-0734<br>Telephone: (850) 385-1551<br>Facsimile: (850) 385-6008<br>Email: tw@nettally.com |
| Bill Lann Lee (SBN 108452)<br>Todd F. Jackson (SBN 202598)<br>Vincent Cheng (SBN 230827)<br>Lindsay Nako (SBN 239090)<br>LEWIS, FEINBERG, LEE, RENAKER &<br>   JACKSON, P.C.<br>1300 Broadway, Suite 1800<br>Oakland, CA 94612<br>Telephone: (510) 839-6824<br>Facsimile: (510) 839-7839<br>Email: blee@lewisfeinberg.com<br>Email: tjackson@lewisfeinberg.com<br>Email: vcheng@lewisfeinberg.com<br>Email: lnako@lewisfeinberg.com | Eric Kingsley (SBN 185123)<br>KINGSLEY & KINGSGLEY<br>16133 Ventura Blvd., Suite 1200<br>Encino, CA 91436<br>Telephone: (818) 990-8300<br>Facsimile: (818) 990-2903<br>Email: kingsleylaw@aol.com |

**COUNSEL FOR MCCORMICK & SCHMICK'S**

Gilmore F. Diekmann, Jr. (SBN 50400)
Eric A. Hill (SBN 173247)
Kamili Williams Dawson (SBN 193264)
SEYFARTH SHAW LLP
560 Mission Street, Suite 3100
San Francisco, CA 94105
Telephone: (415) 397-2823
Facsimile: (415) 397-8549
Email: gdiekmann@seyfarth.com
Email: ehill@seyfarth.com
Email: kdawson@seyfarth.com

Gerald L. Maatman, Jr. (pro hac vice)
SEYFARTH SHAW LLP
131 S. Dearborn Street, Suite 2400
Chicago, IL 60603-5577
Telephone: (312) 460-5000
Facsimile: (312) 460-7000
Email: gmaatman@seyfarth.com

Michael L. Gallion (SBN 189128)
Joshua A. Rodine (SBN 237774)
William C. Thomas (SBN 241789)
SEYFARTH SHAW LLP
2029 Century Park East, #3300
Los Angeles, CA 90067-3063
Telephone: (310) 277-7200
Facsimile: (310) 201-5219
Email: mgallion@seyfarth.com
Email: jrodine@seyfarth.com
Email: wthomas@seyfarth.com

MCCORMICK & SCHMICK'S

_____
Signature

_____
Name and Title

[PROPOSED] CONSENT DECREE
CASE NO. 06-3153 CW